UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIDGET JEAN BARR,

      Plaintiff,                  Civil Action No. 18-10936

          v.                 District Judge Laurie J. Michelson
                               Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Bridget Jean Barr ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner ("Defendant") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. The parties have filed cross-motions for summary judgment, which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Docket #20] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #15] be DENIED.

## PROCEDURAL HISTORY

On June 25, 2014, Plaintiff applied for DIB, alleging disability as of May 21, 2013 (Tr. 161). Following the initial denial of benefits, Plaintiff requested an administrative

hearing, held on April 6, 2017 in Mount Pleasant, Michigan (Tr. 36). John Loughlin, Administrative Law Judge ("ALJ") presided. Plaintiff, represented by attorney Matthew Taylor, testified (Tr. 40-58), as did Vocational Expert ("VE") Shannon Smith (Tr. 59-66). On May 1, 2017, ALJ Loughlin found Plaintiff not disabled on or before her date last insured for DIB benefits of June 30, 2015 (Tr. 11-29). On February 24, 2018, the Appeals Council denied review (Tr. 1-3). Plaintiff filed for judicial review on March 22, 2018.

## BACKGROUND FACTS

Plaintiff, born January 9, 1970, was 45 on the date last insured for DIB benefits (Tr. 29, 161). She completed one year of college and received certifications in medical assistance and phlebotomy (Tr. 197). She worked previously as a care giver, factory laborer, medical assistant, and phlebotomist (Tr. 198). She alleges disability as a result of lumbar disc disease, sacroiliac joint disease, osteoarthritis of the hips, psoriatic arthritis, Post Traumatic Stress Disorder ("PTSD"), anxiety, depression, ischemic attacks, bone spurs, and non-epileptic seizure disorder (Tr. 196).

### A. Plaintiff's Testimony

Plaintiff offered the following testimony:

She worked as a phlebotomist until 2007 (Tr. 41). The job entailed drawing blood, typing lab orders, and stocking shelves (Tr. 42). She spent most of her work shift standing and walking (Tr. 42). The job also required her to stoop, crouch, and lift up to 20 pounds (Tr. 42). Her former work as a medical assistant required checking vital signs, performing

-2-

allergy tests, and documenting and filing charts (Tr. 43).  The job required stooping and lifting up to 15 pounds (Tr. 43-44).  Her work as a care giver involved driving clients to doctors' appointments, and assisting them with bathing, showering, dressing, preparing meals, and paying bills (Tr. 44).  The care giving position required frequent standing and walking and lifting up to 10 pounds (Tr. 44-45).

As the result of an April, 2013 car accident, Plaintiff experienced memory problems due to a closed head injury (Tr. 45-46).  She also experienced neck and back problems (Tr. 45-46).  The back pain was constant, radiating, and accompanied by nausea (Tr. 46).  She experienced daily muscle spasms from lifting and standing (Tr. 47).  She was unable to stand for more than 30 minutes or walk for more than one block (Tr. 47-48).  She could sit up to 30 minutes (Tr. 48).  She coped with back pain by reclining five to eight times a day for 30 minutes with a pillow under her knees (Tr. 48).  She obtained limited relief from a back brace and medication (Tr. 48).  Surgery improved the radiating pain to the extent that she no longer experienced radiating pain from the knee to ankle (Tr. 46, 49).  She continued to experience bladder control problems (Tr. 49).  Steroid injections and nerve blocks did not improve the condition (Tr. 50).

In addition to back pain, Plaintiff experienced neck pain radiating into the upper extremities (Tr. 50).  She was unable to drive for more than 45 minutes at a time (Tr. 50).  She experienced daily headaches (Tr. 50).  She coped with the headaches by lying in a dark room (Tr. 51).  Due to swelling and crepitation of the knees, she used a cane (Tr. 51).  The

knee condition was exacerbated by the weather and standing for long periods (Tr. 51).  She experienced give-way weakness causing falls up to three times a month (Tr. 52).

Due to the closed head injury, Plaintiff continued to experience memory problems, including setting out on a car trip and then being required to call home and ask where she was supposed to be going (Tr. 52).  She had reminder notes posted throughout her house and had others double-check her bill paying to ensure she was not making mistakes (Tr. 53).  She experienced difficulty formatting her speech and experienced reading comprehension problems (Tr. 53).  She experienced depression due to her inability to engage in her former activities and had self-isolated to the extent that she avoided acquaintances in public and was reluctant to leave the house (Tr. 54).

Plaintiff reported that she had been using the cane for two months due to foot problems (Tr. 56).  Her headaches were well controlled with Topamax and Floricet except to the extent that she experienced headaches secondary to neck pain (Tr. 58).

### B.    Medical Evidence

#### 1. Treating Sources

April, 2013 emergency room records following a car accident note Plaintiff's report of head, neck, lower back, right knee, and left hip pain (Tr. 406).  Plaintiff reported a history of "chronic" back pain and migraines (Tr. 406).  She was prescribed Norco and Flexeril for body pain (Tr. 413).  Office treating records from the week following the accident state that the memory loss, dizziness, and amnesia were subsiding (Tr. 416).  Later the same month,

she reported that she was able to do regular activities "without limitations" (Tr. 416). A CT of the abdomen/pelvis showed only mild degenerative changes (Tr. 614). Shannon Michaud, N.P., ("Nurse Michaud") observed a normal mood and affect (Tr. 438). In June, 2013, David L. Farber, M.D. noted Plaintiff's report of continued dizziness (Tr. 475). An clinical examination was unremarkable (Tr. 475-476).

A June, 2013 psychiatric evaluation by Puneet Singla, M.D. notes Plaintiff's report of anxiety, depression, irritability, panic attacks, PTSD, and sleep disturbances (Tr. 320, 497, 518). Plaintiff reported that Cymbalta worked for her most of the time and that she achieved good results from a combination of Pristiq, Prozac, and Zoloft (Tr. 321). She reported the physical problems of migraines, headaches, fibromyalgia, and post concussion syndrome (Tr. 321). She appeared attentive and cooperative, with a normal gait and posture and a normal thought process (Tr. 322). The same month, Nurse Michaud referred Plaintiff to a rheumatologist for complaints of ankle and hip pain (Tr. 691). A June, 2013 EEG study was inconclusive (Tr. 622, 672).

July, 2013 records by Dr. Singla note the psychological strengths of accepting guidance and the capability for "independence" (Tr. 318, 542). Plaintiff's weakness was identified as indecisiveness (Tr. 318). July, 2013 records note that a recent MRI showed "very small abnormal white matter" consistent with a 2005 study (Tr. 363, 368, 619, 675). The same month, emergency treatment providers note that Plaintiff's report of headaches and dizziness were "very nonspecific" (Tr. 665). Plaintiff exhibited normal strength and

vision (Tr. 665).  A CT of the head was unremarkable (Tr. 663).  Plaintiff reported difficulty walking, headaches, dizziness, numbness, and memory problems (Tr. 364).  She demonstrated a normal gait and station (Tr. 364).  The same month, Plaintiff sought emergency treatment for "speech problems," fainting, and blurred vision (Tr. 503).  Neurological findings were unremarkable (Tr. 508).  She demonstrated a normal gait (Tr. 508).

Intake speech therapy records from the same month note "a mild impairment in immediate memory and general recall . . . with obvious delay in processing speed" (Tr. 757).  Plaintiff was deemed "very functional" in cognition and memory but reported continued difficulty in "daily living tasks involving multitasking" (Tr. 374, 757).  Physical therapy records note improvement in gait and balance but reports of continued vertigo (Tr. 383).  She reported that she provided care for her daughter and was a "care giver" for her brother (Tr. 734).  Physical therapy records note that Plaintiff canceled multiple appointments due to personal activities (Tr. 738).  Physical therapy records state that additional therapy was needed to improve upper extremity strength (Tr. 727).  August, 2013 records by University of Michigan Hospital, taken in response to Plaintiff's report of biweekly episodes of disorientation lasting several minutes, note a normal mental status with intact memory (Tr. 335, 556).  An EEG and EKG were both normal (Tr. 337, 350, 550).  Records note that Plaintiff became nauseous and non-verbal during a portion of the EEG (Tr. 338, 350)  but otherwise demonstrated intact memory, fluent speech, and full strength in all extremities (Tr.

340, 564).    Rheumatological records from the same month note Plaintiff's report of intermittent hand stiffness, subsiding back pain, and that she was "doing well" (Tr. 689). Speech therapy records note "good progress in immediate memory" (745, 750). Her potential was deemed good (Tr. 748).

January and April, 2014 examinations showed no rheumatoid deformities (Tr. 686, 688).  In April, 2014, Plaintiff sought emergency treatment for back pain (Tr. 643).  A May, 2014 MRI of the lumbar spine showed only mild disc degeneration (Tr. 639).  June, 2014 imaging studies of the left hip showed only mild osteoarthritis (Tr. 636).  A study of the right hip was wholly negative (Tr. 637).  August, 2014 rheumatological records note Plaintiff's report of back and hip pain but no signs of acute distress or rheumatoid deformities  (Tr. 683).  The same month, Jayant Jagannathan, M.D. observed normal strength in the lower extremities (Tr. 810, 872).  An October, 2014 CT of the lumbar spine showed a small disc bulge at L4-L6 and mild to moderate stenosis at L5-S1 (Tr. 787, 797).   In October, November, and December, 2014,  Dr. Jagannathan performed lumbar spine nerve blocks with steroid injections (Tr. 799-800, 802, 806).  November, 2014 imaging studies of the pelvis showed only mild degenerative changes (Tr. 774).  A November, 2014 MRI of the lumbar spine and December, 2014 MRI of the thoracic spine showed a "tiny" disc protrusion at T10-T11 (Tr. 700, 773, 791, 795).

In March, 2015, Dr. Jagannathan performed a lumbar fusion at L5-S1 (Tr. 860, 935). Post-surgical imaging studies were unremarkable (Tr. 864).   Post surgical records note full orientation, good judgment, normal memory, and normal speech (Tr. 898-899).   Dr. Jagannathan noted that Plaintiff reported an improvement in back pain (Tr. 939-940).  Home care notes from later the same month note that her rehabilitation potential was "good" (Tr. 908).  The following month, Dr. Jagannathan composed a letter on Plaintiff's behalf, stating that she had a "temporary disability" from March 6 to June 6, 2015 (Tr. 917, 932).

In April, 2015, Nurse Michaud found that Plaintiff was limited to lifting less than 10 pounds occasionally, standing/walking for less than two hours in an eight-hour workday, and sitting for less than six (Tr. 953).  She precluded all reaching, pushing/pulling, and operation of foot controls (Tr. 953).  She found that Plaintiff's work abilities were also limited by concentrational and memory issues related to either an underlying mental health problem or medication side effects (Tr. 954).   The same month, psychological intake records note Plaintiff's report of excessive worry, anxiety, tearfulness, and suicidal ideation (Tr. 920). The interviewer noted a possible personality disorder along with depression and bipolar symptoms (Tr. 920).   Plaintiff reported family-related stressors (Tr. 920-921).  Plaintiff reported memory problems but exhibited normal speech and full orientation (Tr. 922).  The same month, a right foot exam showed diagnoses of talipes cavus and Raynaud's disease (Tr. 928).

In May, 2015, Dr. Jagannathan cleared Plaintiff for bariatric surgery (Tr. 938). July, 2015 counseling records note a normal gait (Tr. 977). An August, 2015 MRI of the cervical spine showed "minimal" bulging (Tr. 1079). September, 2015 psychological records note that Plaintiff was doing "okay" psychologically but experienced situational stressors (Tr. 987). In October, 2015, Nurse Michaud found that Plaintiff was limited to lifting less than 10 pounds occasionally, standing/walking for less than two hours in an eight-hour workday, and sitting for less than six (Tr. 949).

A September, 2016 neuropsychological evaluation by Gerard William, Ph.D. notes Plaintiff's allegations of tearfulness, depression, back pain, and concentrational problems (Tr. 956). Dr. Williams noted that Plaintiff did not demonstrate confusion as to the testing process and was fully oriented (Tr. 957-958). Testing showed borderline verbal comprehension, perceptual reasoning, working memory, and full scale IQ scores (Tr. 958). Dr. Williams concluded that Plaintiff's ability to remember locations, make simple work decisions, and complete a workweek without interruption from psychological symptoms was mildly to moderately impaired (Tr. 965). He assigned her a GAF of 51[1] (Tr. 972). The same month, an MRI of the left ankle showed a small cyst but no other abnormalities (Tr. 1098).

---

[1]

A GAF score of 51 to 60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4thed.2000)("*DSM-IV-TR*"), 34.

February, 2017 podiatry records note Plaintiff's report of foot pain for the past five months (Tr. 1086). In March, 2017, counselor Rachel West, noting that she had treated Plaintiff since April, 2015, stated that Plaintiff's anxiety had increased in the past six months to the point where she avoided leaving the house (Tr. 1101).

### 2. Non-Treating Sources

In May, 2015, psychiatrist Robert Newhouse, M.D. performed a non-examining review of the treating records on behalf of the SSA, finding that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 76-77). Dr. Newhouse also completed a Mental Residual Functional Capacity Assessment, finding moderate limitation in carrying out detailed instructions, maintaining concentration for extended periods, maintaining regular attendance, and completing a workweek without psychologically based interruption or excessive rest periods (Tr. 81). He found that Plaintiff was capable of "simple tasks" on a "sustained basis" (Tr. 82).

### C. Vocational Expert Testimony

VE Shannon Smith stated that her testimony would be consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT"*) and *Selected Characteristics of Occupations* ("*SCO*") (Tr. 59-60). She classified Plaintiff's past relevant work as a companion as semiskilled and exertionally light[2] (exertionally medium as performed);

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds

medical assistant, skilled/light; and phlebotomist, semiskilled (skilled as performed)[3]  (Tr. 60-61).

ALJ Loughlin then posed the following question to the VE, describing a hypothetical individual of Plaintiff's age, education, work experience:

> [L]ight exertional level . . . . [e]xcept the individual can frequently push or pull or operate foot controls with the lower extremities.  Assume that the individual can occasionally kneel, crouch, stoop, balance and crawl, can occasionally climb stairs and ramps, can never climb ladders, ropes and scaffolds and can never be exposed to vibrations, unprotected heights and moving machinery parts . . . . Also assume that the individual is able to understand and remember simple instructions, make simple workplace decisions, carry out simple instructions, can occasionally deal with changes in a routine work setting and can occasionally deal with supervisors, coworkers, and the public.  Would the individual be able to perform the claimant's past relevant work either as she actually performed the work or as those occupations are generally performed in the national economy? (Tr. 61-62).

The VE testified that the above limitations would preclude Plaintiff's past work but would allow for the exertionally light, unskilled work of a garment sorter (200,000 positions in the national economy);  housekeeper (900,000); and  office helper (70,000)  (Tr. 62-63).

---

at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

[3]The VE did not provide an exertional level for the position of phlebotomist.  The *DOT* classifies the position as exertionally light.  *DOT* Job Code 079.364-022.

The ALJ posed a second question limiting the individual to *sedentary* work with a sit/stand option allowing a change of position every 30 minutes; need for a cane for ambulation; the ability to occasionally push, pull, operate foot controls, kneel, crouch, stoop, balance crawl and climb stairs and ramps; and, a preclusion on use ladders, ropes, scaffolds, vibrations, unprotected heights, and moving machinery parts (Tr. 63-64). The ALJ left intact the mental limitations set forth in the original question (Tr. 64).

The VE found that the second set of limitations would preclude all competitive work due to the limitation to sedentary work, along with the need for a sit/stand option and only occasional contact with the public (Tr. 64). She noted that her testimony regarding the sit/stand option was based on her own professional experience (Tr. 64).

In response to questioning by Plaintiff's counsel, the VE testified that the need to miss one day of work each week would preclude all work (Tr. 65). She stated that the need for a cane for walking would preclude all exertionally light work (Tr. 65). Finally, she testified that either the need for redirection by a supervisor every hour, or, the presence of "impaired focus and memory" limiting her to 80 percent of the pace of other employees would preclude all work (Tr. 66).

**D.  The ALJ's Decision**

Citing the medical records, ALJ Loughlin found that Plaintiff experienced the severe impairments of "lumbar degenerative disc disease post fusion, migraines, post-concussion syndrome, Raynaud's disease, peripheral vascular disease, obesity, major depressive disorder,

-12-

and anxiety " but that none of the conditions met or medically equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 13-15). He found that a right ovary cyst, mild degenerative changes to the hip, disc osteophyte complex of the cervical spine, paracentral disc protrusion of the thoracic spine, and "bowel issues" were non-severe impairments (Tr. 13). The ALJ noted that despite a diagnosis of fibromyalgia, it did not rise to the level of a medically determinable impairment (Tr. 14). The ALJ found that Plaintiff experienced moderate limitation in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and in adopting or managing oneself (Tr. 17-18).

The ALJ found that through the date last insured for DIB of June 30, 2015, Plaintiff retained the residual functional capacity ("RFC") for light work with the following additional limitations:

> [S]he could have occasionally kneeled, crouched, stooped, balanced, and crawled, could have occasionally climbed stairs and ramps, could never have climbed ladders, ropes and scaffolds, and could never have been exposed to vibrations, unprotected heights and moving machinery parts. The claimant was able to understand and remember simple instructions, make simple work related decisions, carry out simple instructions, and could have occasionally dealt with changes in a routine work setting, and could have occasionally dealt with supervisors, coworkers, and the public (Tr. 18).

Citing the VE's testimony, the ALJ found that Plaintiff could work as a garment sorter, housekeeper, and office helper (Tr. 28, 62-63).

The ALJ discounted Plaintiff's professed degree of limitation. As to the psychological symptoms, he cited June, 2013 records showing that she was attentive and

cooperative with good hygiene and a normal thought process (Tr. 23).  He cited April, 2015

records noting normal sleep and appetite and no significant medication side effects (Tr. 23).

He noted reports of only mildly impaired concentration on one occasion but good insight,

judgment and normal speech (Tr. 23).  He accorded Dr. Newhouse's non-examining

psychological findings  "great weight" (Tr. 26).  He accorded counselor West's finding

"some weight," noting that her finding of disability level psychological limitation stood at

odds with her treating notes indicating that Plaintiff "was very active in making [positive]

changes in her life" (Tr. 26).

In regard to the allegations of physical limitation, the ALJ noted that Dr.

Jagannathan's April, 2015 disability opinion was limited to the three months following the

fusion surgery (Tr. 24).  He noted that Plaintiff was able to walk without an aid shortly after

surgery (Tr. 24).  He accorded little weight to Dr. Michaud's opinions of disability, noting

that treating notes before and after the fusion surgery note a normal gait, full motor strength,

and a full range of extremity motion (Tr. 25).

### STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine

whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of

Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more

than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S.

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has

the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984)

## ANALYSIS

### A.  Substantial Evidence

In her first argument, Plaintiff faults the ALJ's finding of only temporary disability following March 7, 2015 lumbar fusion surgery.  *Plaintiff's Brief,* 10-14, *Docket #15,* Pg ID 1163.  She argues that the ALJ's accord of "great weight" to Dr. Jagannathan's opinion of temporary disability between March 6 and June 6, 2015 stands at odds with the ALJ's observation of an improved physical condition within the three-month "disability." *Id.*  She also contends that the records created in the latter part of 2015 and 2016 support the conclusion that the disability continued well beyond the three months following surgery. *Id.* at 13-14.

In adopting Dr. Jagannathan's opinion that Plaintiff was disabled from March 6 to June 6, 2015 (Tr. 917, 932), the ALJ reasoned as follows:

> [The disability opinion] was made in the aftermath of the claimant's lumbar fusion surgery.  In the immediate aftermath of her surgical procedure, she used a walker, required help with activities of daily living, [] and had a visiting nurse.  However, by March 21, 2015, the claimant was ambulatory under her own power and reported an improvement in her back pain.  In April, 2015, Dr. Jagannathan also noted that the claimant appeared to be doing well. Furthermore, an April, 2015 lumbar x-ray showed a well aligned L5-S1 with hardware in proper position (Tr. 24-25)

-16-

The ALJ's inference that the treating records created in the three months following surgery showed a normal recovery (coupled with Dr. Jagannathan's finding that the disability was only temporary) supports the finding that Plaintiff was not incapable of a limited range of light work for more than three months or for any continuous 12-month period beginning before the June 30, 2015 expiration of benefits.  *See* 42 U.S.C. §423(d)(1)(A)(claimant must show that disability "has lasted or can be expected to last for a continuous period of not less than 12 months").  The fact that the ALJ agreed that Plaintiff was temporarily disabled between March 6 and June 6, 2015 does not prevent him from observing that her condition continued to improve during the three-month recovery.

Plaintiff appears to argue that her "temporary disability" beginning on March 6, 2015 lasted for a continuous period of 12 months or more after the last date insured of June 30, 2015.  However, the post-expiration  records contain substantial support for the finding that she did not experience continuous disability.  In July, 2015, Plaintiff exhibited a normal gait (Tr. 977).  While Plaintiff cites a September, 2015 treating *reference* to a MRI of the lumbar spine showing a "bulge" (this report itself is not in the record), there is no indication of whether the bulge was mild, moderate, or severe (Tr. 1077).  An actual report regarding an MRI of the cervical spine states a finding of  only "minimal" bulging (Tr. 1079).  Despite Plaintiff's report of difficulty walking, she exhibited 5/5 strength in the bilateral lower extremities except for mild weakness of the right plantar flexion and dorsiflexion (Tr. 1077).  Plaintiff's allegations that she was incapable of the lifting requirements of light work is

undermined by February, 2016 records showing full muscle strength in the upper extremities and a normal gait and station (Tr. 1073).  March, 2016 EMG testing of the upper extremities showing unremarkable results also undermines her claim that she was limited to lifting less than 10 pounds on an occasional basis (Tr. 1076).  December, 2016 records note Plaintiff's report of joint stiffness but no muscle weakness (Tr. 1093).

As discussed further below, the ALJ also noted that the treating records predating the surgery and showing a normal gait and full motor strength stood at odds with the allegations of disability (Tr. 21-22).  Because substantial evidence supports the ALJ's finding that Plaintiff's "disability" did not last for longer than the three month period between March 6 and June 6, 2015, the administrative findings should remain undisturbed.

### B.  Nurse Michaud

Plaintiff also argues that the ALJ erred by rejecting Nurse Michaud's April and October, 2015 findings of the inability to perform even sedentary work (Tr. 25).  *Plaintiff's Brief* at 15-18.  She also faults the ALJ for rejecting Nurse Michaud's finding that concentrational problems would interfere with the ability to work on the basis that she was not a mental health expert, arguing that Nurse Michaud was not providing a "mental health opinion," but rather, opining that the physical discomfort and/or medication side effects would be expected to cause workplace interruption.  *Id.* at 17.

Under SSR 06-03p, medical sources are divided into "acceptable medical sources," including medical or osteopathic doctors, and "other health care providers" who are not acceptable medical sources ("non-acceptable medical sources"). 2006 WL 2329939, *1-2 (August 9, 2006). Non-acceptable medical sources include "nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists ..." *Id.* at *2. Under the SSA regulations, an acceptable medical source is required to establish the existence of a medically determinable impairment and "only 'acceptable medical sources'" can provide medical opinions. *Id.* (*citing* 20 C.F.R. 404.1527(a)(2), 416.927(a)(2)).   Nonetheless, the opinions of non-acceptable medical sources are "entitled to consideration due to [their] expertise and long-term relationship" with a claimant. *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011); 20 C.F.R. §§ 404.1502, 404.1513.  In weighing the opinions of "other sources," it is "appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06–3p, at *2.

As discussed in Section II.B.1, in April, 2015, Nurse Michaud found that Plaintiff was incapable of lifting even 10 pounds; walking/standing for even two hours in an eight-hour workday; or siting for even six  hours (Tr. 953). She precluded all reaching, pushing/pulling, and operation of foot controls (Tr. 953).  She found that Plaintiff's work abilities were also limited by concentrational and memory issues related to either an underlying mental health problem or medication side effects (Tr. 954).  In  October, 2015, Nurse Michaud found that

-19-

Plaintiff was limited to lifting less than 10 pounds occasionally, standing/walking for less than two hours in an eight-hour workday; and sitting for less than six (Tr. 949).

The ALJ provided a two-paragraph rationale for giving Nurse Michaud's April, 2015 assessment "little weight" (Tr. 25). The ALJ noted that Plaintiff showed steady progress in the months following the March, 2015 fusion surgery (Tr. 25). He noted that the records predating the fusion surgery showed full strength, a normal gait, and a full range of motion "even in the immediate aftermath of [the] April, 2013 motor vehicle accident" (Tr. 25). The ALJ noted that he rejected Nurse Michaud's October, 2015 finding that Plaintiff was incapable of even sedentary work for the same reasons (Tr. 25). The ALJ found that the opinion that Plaintiff was limited by concentrational and memory issues related to an underlying mental health problem was outside of Nurse Michaud's area of expertise as a family nurse practitioner (Tr. 25, 954).

Contrary to Plaintiff's argument, the ALJ's rejection of Nurse Michaud's assessments is well supported by the evidence as a whole. While Plaintiff reported debilitating physical and mental limitation following the April, 2013 car accident, records created later the same month noted the ability to do regular activities "without limitations" (Tr. 416). July, 2013 records note a normal gait and station despite the allegations of difficulty walking (Tr. 364). Plaintiff reported that she was able to care for her daughter (Tr. 734). Speech and physical therapy records from July and August, 2013 showed good improvement (Tr. 383). August, 2013 EEG and EKG testing was normal (Tr. 337, 350, 550). Plaintiff showed intact memory,

-20-

fluent speech, and full strength (Tr. 340).  A May, 2014 MRI of the lumbar spine showed only mild degenerative changes (Tr. 639).  In August, 2014, Dr. Jagannathan noted full strength in the lower extremities (Tr. 810).  While an October, 2014 CT of the lumbar spine showed mild to moderate stenosis at L5-S1, an MRI of the lumbar spine from the next month showed only mild stenosis at L4-L5 (Tr. 700).  To the extent that  the March, 2015 fusion surgery supports the finding that Plaintiff required greater than conservative treatment sometime between October, 2014 and March, 2015 (or, became "disabled" during this period) the post-surgical records show that the condition improved following fusion surgery. Even assuming that disability could be established as of the October, 2014 CT up to the March, 2015 surgery *and* that pursuant to Dr. Jagannathan's letter, the disability continued until June 6, 2015, the evidence strongly supports the ALJ's conclusion that she did not experience disability lasting (or expected to last) for any continuous 12-month period prior to the expiration of benefits.

Likewise, the ALJ did not err in rejecting Nurse Michaud's finding of concentrational and memory issues related to an underlying mental health problem as "outside the area of her expertise" (Tr. 25, 954).  None of the records created by Nurse Michaud suggest that she was a mental health expert.  While Plaintiff argues that Nurse Michaud permissibly found that the physical problems would be expected to create concentrational problems, Nurse Michaud clearly attributed  the concentrational limitations to either medication side effects or an underlying mental health condition (Tr. 954).  Nurse Michaud's findings regarding the

alleged mental limitations are particularly weak, given that within a few weeks after the car accident, she personally noted that Plaintiff exhibited a normal mood and affect (Tr. 438). The extensive imaging and clinical  studies performed in the second half of 2013 fail to support Plaintiff's claim that she was unable to perform even unskilled work due to cognitive or psychological problems (Tr. 363, 663, 665, 508).  Notably, intake speech therapy records note only "mild impairment" in immediate memory (Tr. 757) and records from the following month note intact memory, fluent speech, and full strength (Tr. 340).

Accordingly, the ALJ's rejection of Nurse Michaud's findings of both physical and mental limitation should not be disturbed.

### C.  Dr. Newhouse's Non-Examining Assessment

Finally, Plaintiff argues that while the ALJ purported to accord "great weight" to Dr. Newhouse's May, 2015, non-examining assessment (Tr. 26, 81), the hypothetical question to the VE forming the basis of the RFC did not reflect Dr. Newhouse's finding of moderate limitation in maintaining attention and concentration; working within a schedule, maintaining regular attendance; and working at a consistent pace (Tr. 81).  *Plaintiff's Brief* at 19.  She points out that the VE testified that the need to miss one day of work each week, need for redirection each hour, or the need to work at only 80 percent of the pace of other employees would preclude all work (Tr. 66).  She argues, in effect, that an RFC containing all of Dr. Newhouse's findings would direct a finding of disability.  *Id.*

Plaintiff is correct that job testimony given in response to a hypothetical question that does not include all of a claimant's relevant limitations does not constitute substantial evidence. *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 516 (6th Cir. 2010); *Varley v. Commissioner of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987); see also *Teverbaugh v. Commissioner of Social Security* , 258 F.Supp.2d 702, 706 (E.D. Mich. 2003) (Roberts, J)(reversible error for ALJ to rely upon unsupported job findings).

As an initial matter, Dr. Newhouse's finding of moderate limitation in maintaining attention and concentration; working within a schedule, maintaining regular attendance; and working at a consistent pace (Tr. 81) cannot be interpreted to state that such limitations were disabling. Notwithstanding the finding of moderate limitations, Dr. Newhouse concluded that Plaintiff was capable of performing "simple tasks" on a "sustained basis" (Tr. 82). Second, the ALJ's accord of "great weight" to Dr. Newhouse's opinion appears to refer to Dr. Newhouse's conclusion that the "mental impairments do not produce disabling symptoms" rather than the adoption of every one of the psychologist's discrete findings (Tr. 26). After stating that Dr. Newhouse's opinion was entitled to "great weight," the ALJ went on to note that the psychological treating records did not support the finding that Plaintiff was incapable of a range of simple, unskilled work (Tr. 26). My own review of the treating records repeatedly showing normal memory, normal speech, and full orientation also supports the finding that Plaintiff was not incapable of a range of simple, routine, unskilled work (Tr. 335, 922, 957-958, 987).

-23-

However, the hypothetical question forming the basis of the ultimate RFC reflects both Dr. Newhouse's finding of moderate psychological limitation *and* his conclusion that the limitations were not disabling.   In regard to the moderate limitation in maintaining attention and concentration for "extended periods," (Tr. 81), the ALJ limited Plaintiff to understanding and remembering simple instructions (Tr. 18).   As to working "within a schedule," "maintaining regular attendance,"  "working at a consistent pace," and moderate limitation in the ability to complete a workweek without psychologically based interruption, the ALJ limited Plaintiff to making simple work related decisions, carrying out simple instructions, routine changes in the work setting, and only occasional interaction with others (Tr. 18).   Notably, none of the VE's job findings (garment sorter, housekeeper, or office helper) require assembly work or performing work in tandem with others (Tr. 62-63). Because the hypothetical question and ultimate RFC reflect Dr. Newhouse's finding of less than disabling psychological limitation, a remand on this basis is not warranted.

In closing, my recommendation to uphold the ALJ's findings should not be read to trivialize Plaintiff's legitimate health concerns or situation stressors.  However, because the determination that she was not disabled is within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court.  *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #20] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #15] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: February 25, 2019

-25-

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on February 25, 2019, electronically and/or by U.S. mail.

<u>s/Carolyn M. Ciesla</u>

Case Manager to the
Honorable R. Steven Whalen